UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JULIE ANN HANSON, individually and as Personal Representative of the ESTATE OF MARILYN MOWAN, deceased,<br><br>Plaintiff,<br><br>v.<br><br>SNOHOMISH COUNTY, a municipal corporation, TY TRENARY, KAITLIN GEARY, JEFFREY LANGSAM, and JULIE ROUNTREE,<br><br>Defendants. | NO.<br><br>COMPLAINT<br>(Deprivation of Civil Rights)<br><br>JURY DEMAND |

COMES NOW the above-named Plaintiff, by and through her attorney of record, Cheryl L. Snow of the Law Offices of James S. Rogers, and by way of claim alleges upon personal knowledge as to herself and her own actions, and upon information and belief upon all other matters, as follows:

## I.     PARTIES

1.     Plaintiff Julie Ann Hanson is the sister and the duly-appointed Personal Representative of the Estate of Marilyn Mowan, deceased.  At all relevant times, Julie Ann Hanson

COMPLAINT – 1

1    was a citizen of the United States and lived in Snohomish County. Julie Ann Hanson brings claims

2    individually, and as Personal Representative of the Estate of her sister, Marilyn Mowan.

3          2.      Marilyn Mowan, the decedent, was 62 years old when she died on September 23,

4    2014, while housed at the Snohomish County Jail. At all relevant times, Marilyn was a citizen of

5    the United States, living in Snohomish County, and as such was entitled to all rights, privileges,

6    or immunities guaranteed under state law, federal law, and the Washington State and U.S.

7    Constitutions. Marilyn's Estate brings claims through her surviving sister and Personal

8    Representative, Julie Ann Hanson.

9          3.      At all material times, defendant Snohomish County was a municipal corporation

10    organized under the laws of the State of Washington, which by and through its agency, the

11    Snohomish County Sheriff's Office ("SCSO") and its Snohomish County Corrections Bureau

12    ("SCCB"), operated, managed and controlled the Snohomish County "Oakes Street" Jail ("SCJ")

13    and employed, engaged and/or contracted with the remaining named defendants. Snohomish

14    County is a public body responsible under state law for the acts and omissions of its employees,

15    officials, and contractors, including those whose conduct is at issue.

16          4.      At all material times, defendant Ty Trenary ("Sheriff Trenary") was employed by

17    Snohomish County as the elected Sheriff for Snohomish County and acting under color of law. In

18    his role as Snohomish County Sheriff, Defendant Trenary is responsible for the operation,

19    administration, and management of the SCSO, SCCB, and SCJ, including formulating and

20    implementing SCSO's policies and procedures and ensuring that its deputies are properly and

21    adequately trained. Additionally, it is his responsibility to evaluate SCSO employees' conduct and

22    to impose discipline if warranted.

23          5.      At all material times, defendant Kaitlin Geary ("Deputy Geary") was employed by

COMPLAINT – 2

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA 98101
Ph: 206/621-8525 Fax: 206/223-8224

1  Snohomish County as a corrections deputy, whose duties and responsibilities included providing

2  for the custody and care of inmates, including monitoring inmates' mental and physical health. At

3  all relevant times, Deputy Geary was acting under color of law within the course and scope of her

4  employment.

5       6.    At all material times, defendant Jeffrey Langsam ("RN Langsam") was licensed in

6  Washington as a registered nurse and employed by Snohomish County as a nurse at SCJ.  His

7  duties and responsibilities included performing nursing assessments pursuant to defined protocols,

8  assuring that immediate inmate health care needs are met, and coordinating appropriate follow-up

9  care.  At all material times, RN Langsam was acting under color of law and within the course and

10  scope of his employment.

11       7.    At all material times, defendant Julie Rountree ("MHP Rountree") worked as a

12  Mental Health Professional (MHP) employed by Snohomish County at the SCJ.  Her duties and

13  responsibilities included performing mental health assessment pursuant to defined protocols,

14  assuring that immediate mental health care needs are met, that risk for self-harm is protected

15  against, and coordinating appropriate specialized follow-up care.  At all material times, MHP

16  Rountree was acting under color of law and within the course and scope of her employment.

17  ## II.     JURISDICTION AND VENUE

18       8.    This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

19       9.    Venue is proper in the Western District of Washington pursuant to 28 U.S.C. §1391

20  because Defendant Snohomish County resides in this judicial district and because a substantial

21  portion of the events and omissions giving rise to this claim occurred in Snohomish County,

22  Washington, within the Western District of Washington.

23       10.    Tort claims were filed in this matter pursuant to RCW 4.96, et seq., and over sixty

COMPLAINT – 3

1    (60) days have gone by without resolution of the claims.

2                            III.    STATEMENT OF FACTS

3    **A. Defendants' Deliberate Indifference to Marilyn's Serious Mental Health Needs.**

4           11.     Marilyn Mowan was 62 years old at the time of her death.  She was a gravely,

5    chronically mentally ill woman who had been treated in the outpatient community health setting

6    for years.   Along with Type 1 Bipolar Disorder, Marilyn also suffered from psychogenic

7    polydipsia, a serious psychiatric condition that compelled her to consume dangerous amounts of

8    water.  This psychiatric condition and Marilyn's risk for self-harm was well known by the SCJ

9    based on Marilyn's previous stays at the jail, including a stay one month prior to her death that

10   ended with a medical emergency being declared when Marilyn was found unresponsive in her cell

11   after consuming a near lethal quantity of water.   As described below, Marilyn's death, which the

12   Medical Examiner attributed to water intoxication, was the direct result of the defendants'

13   deliberate indifference to her serious mental health needs.

14          12.     On September 19, 2014, Marilyn was arrested for slapping a mental health care

15   worker at Compass Mental Health.  Following the arrest, a police officer transported Marilyn to

16   the Snohomish County Jail (SCJ) for booking.

17          13.     Upon Marilyn's arrival at the SCJ, defendant RN Langsam performed a "fit for jail"

18   evaluation to determine whether Marilyn was mentally and physically "fit for jail".  Following his

19   "evaluation", RN Langsam concluded that Marilyn suffered from no mental health issue and

20   approved her placement into general population.  It is apparent that RN Langsam conducted no

21   meaningful assessment as to whether Marilyn was "fit for jail".   He either failed to look at or

22   ignored documentation that was replete throughout Marilyn's jail medical file from prior bookings

23   describing the severity of her mental illness and her documented risk for self-harm.  RN Langsam's

COMPLAINT – 4                           **LAW OFFICES OF JAMES S. ROGERS**
                                        1500 Fourth Avenue, Suite 500
                                        Seattle WA  98101
                                        Ph:  206/621-8525  Fax: 206/223-8224

meaningless assessment and apparent inability to identify a chronically, gravely mentally ill individual that resulted in a finding that Marilyn was "fit for jail" and that the jail would be able to adequately care for and provide services to Marilyn, demonstrated a deliberate indifference to Marilyn's obvious and apparent mental illness.

14.     After accepting Marilyn into the jail, neither RN Langsam, nor any other employee at the SCJ contacted Compass Mental Health to obtain specific necessary information about the nature of Marilyn's mental illness and what was necessary for her treatment while she was housed at the SCJ.  No effort was made to receive updated, relevant information about Marilyn's potential for self-harm by water-consumption or other means.   This failure amounted to deliberate indifference and ignored extensive documentation throughout Marilyn's inmate file regarding her long standing treatment at Compass Mental Health, the name and phone number of her case manager, and the willingness of Marilyn's case worker and staff at Compass to provide necessary information and assistance.

15.     Records obtained from the SCJ show that the serious nature of Marilyn's risk for self-harm was known and apparent to the defendants.  The records evidence knowledge arising from Marilyn's prior stays at SCJ, including a stay in August of 2014, that resulted in a medical emergency at the jail after a deputy found Marilyn lying in her cell unresponsive and barely breathing.  On August 4, 2014, after jail staff declared a medical emergency, Everett Fire medics arrived at the SCJ and transported Marilyn to Providence Hospital where she lay in a coma for over a week.  Hospital doctors attributed Marilyn's condition to water intoxication, and it is well documented throughout the medical records that Marilyn suffered from psychogenic polydipsia, a serious psychiatric condition in which the patient has a compulsion to consume dangerous amounts of water.

COMPLAINT – 5

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

16.     Once Marilyn was released from Providence Hospital in August of 2014, she resumed her outpatient mental health treatment at Compass Mental Health, where she had been receiving treatment for years.    Records from Compass show consistent documentation of Marilyn's psychogenic polydipsia and her risk for self-harm from water intoxication.  Records show that following her release from Providence Hospital she openly and frequently talked about the medical emergency that had occurred at the SCJ and her compulsion to over-drink water.  In the weeks prior to her death, Marilyn repeatedly told staff that she feared that she would drink too much water and expressed self-harming thoughts involving overconsumption of water.   On September 11, 2014, police transported Marilyn from her apartment to Compass after she called 911 reporting that she was suicidal.  Following her arrival at Compass, Marilyn told just about anyone who would listen that she was going to drink so much water that she would have a seizure like the last time (she was in the SCJ) and die.

17.     By failing to conduct a meaningful assessment at booking, SCJ employees demonstrated a deliberate indifference to Marilyn's well documented serious mental illness.  In addition to the records and events described above, the SCJ had knowledge that included the name of Marilyn's caseworker at Compass and the following prior jail safety alerts:  "DO NOT RELEASE PER Compass Health, gravely disabled" and "[P]lease release during the day so that inmate can walk to Compass Health during business hours where her case manager will wait for her."  The records provided both the name and direct phone number for Marilyn's case manager, who had communicated with the SCJ on prior occasions.

18.     Not surprisingly, within a day of being placed in general population, Marilyn's mental illness caused her difficulty, and jail deputies requested that she be placed in a special unit that could accommodate her mental illness.  In stark contrast to defendant RN Langsam's finding

COMPLAINT – 6

that Marilyn suffered from no mental health issues, deputies who interacted with Marilyn observed her as exhibiting signs of disassociation and paranoia and being confused about her surroundings and incarceration.  Deputies overheard Marilyn repeatedly making self-harm statements, yet there appears to be no record made by deputies of the specific statements that she made and/or the manner in which she claimed that she intended to harm herself.  Based on the deputies' concerns, Marilyn was moved to a mental health observation unit and placed on a 10-minute suicide watch.

19.    On September 21st, Julie Rountree, a mental health professional ("MHP") for the jail removed the 10-minute watch of Marilyn.  MHP Rountree's decision was made without conducting a comprehensive suicide risk assessment that included at minimum:  a description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history; level of lethality and recommendations and/or a treatment plan.  MHP Rountree acted without input from or communication with Marilyn's mental health care providers at Compass Mental Health.  There is no evidence to support MHP Rountree's conclusion that Marilyn's risk for self-harm, which was well documented throughout her medical file from her current and prior stays, had somehow diminished while Marilyn was in custody.  The decision to remove the 10-minute suicide watch completely ignored Marilyn's long documented history of decompensating while incarcerated, instead of improving, particularly when she was isolated in a cell without access to adequate psychiatric care.  Rountree's decision also ignored Marilyn's warning to MHP staff about her risk for self-harm arising from the disorder that compelled her to over consume water, including Marilyn's documented statement expressing her fear to a jail mental health worker, "I don't think my meds is working.  I'm afraid I will drink too much water."

20.    MHP Rountree's decision that Marilyn no longer posed a risk for self-harm, was

COMPLAINT – 7

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

1   deliberately indifferent to Marilyn's serious mental health needs and risk for self-harm.   MHP

2   Rountree's decision is particularly concerning considering that the exact same decision one month

3   prior by a fellow SCJ MHP resulted in the medical emergency described above where medics had

4   to transport Marilyn from the SCJ to Providence Hospital where she lay in a coma for weeks.   Jail

5   records from August 4, 2014 establish that MHP Elizabeth Bellmer directed that the jail's 10-

6   minute watch of Marilyn be removed.   Just one day after Bellmer directed that the suicide watch

7   be removed, an ambulance had to be summoned to the SCJ after a deputy discovered Marilyn

8   unconscious in her cell during a routine check.   The ambulance rushed Marilyn to Providence

9   where she was treated for her near lethal ingestion of water.

10       21.       After the 10-minute watch was dropped on September 21st, Marilyn remained in

11   the Observation Unit (OU) of the SCJ.   The OU module consists of eight "observation" cells and

12   two "safety" padded cells.   On the morning of September 23, 2014, Deputy Kaitlin Geary was

13   assigned to the graveyard shift and responsible for all of the inmates housed in the OU.

14   Responsible for only a few inmates that morning, Deputy Geary was required to know who the

15   inmates were, what their needs were, and what type of watch was required for each.   Deputy Geary

16   admits that she was familiar with Marilyn, from prior contact during a previous booking.

17       22.       On the morning of September 23rd, in the hallway where cells #1-4 were located,

18   Marilyn was isolated from other inmates and was the only person occupying a cell.   Deputy Geary

19   knew that she was required to check on Marilyn at minimum every 30 minutes.   Jail surveillance

20   video for the hour prior to Marilyn's death obtained by Marilyn's family reveals that Deputy Geary

21   ignored that requirement and, in so doing, utterly ignored the known serious mental health needs

22   of Marilyn.   Claims by Deputy Geary and Cpt. Jamie Kane ("Cpt. Kane") that Marilyn was

23   observed to be perfectly fine minutes before she was discovered unconscious in her cell are not

COMPLAINT – 8

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525   Fax: 206/223-8224

credible in light of Marilyn's condition and the condition of her cell when the medical emergency was declared and jail surveillance video.  Upon information and belief, the credibility of Geary and Kane will be seriously questioned along with the SCJ's intentional destruction of evidence that includes:  destroying all jail surveillance video beyond the one hour provided, altering the death scene before investigators arrived, and Cpt. Kane approving defendant Geary's departure from the SCJ before investigators arrived.

23.     A review of the jail surveillance video from the hour prior to when Marilyn was found unconscious in her cell shows that 45 minutes passed between when defendant Geary had last checked on Marilyn (and every other inmate in the Observation Unit) and her discovery of Marilyn lying in the back of her cell unconscious, in a large puddle of water and waste, naked from the waist down.  Photographs of Marilyn's cell document water and waste all over the floor and a puddle where water had literally poured out of her body.  Medics who attempted CPR on Marilyn, described her startling condition upon their arrival, noting, "pt abdomen distended upon arrival to jail and copious amounts of what appeared to be water was observed pouring from pt mouth during the majority of the resuscitation."  One of the medics had to request a towel to use to dry off after performing CPR.  Deputies had to mop the area around Marilyn before medics arrived.

24.     A review of 50-minute surveillance video provided by the jail depicts the following:

|  |  |
|---|---|
| 6:56 a.m. | Geary walks by Marilyn's cell and glances in. |
| 6:57 a.m. | Geary returns to her desk and sits down. |
| 6:58 a.m. | Geary writes in a log and makes a brief phone call. |
| 7:00 a.m. | Geary pulls out the newspaper and starts to read it. |
| 7:03 a.m. | Geary gets on her computer. |
| 7:09 a.m. | Geary begins a phone conversation that lasts for 10 minutes. |

COMPLAINT – 9

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

| | | |
|---|---|---|
| 1 | 7:19 a.m. | Geary ends her 10 minute call, hangs up the phone, and walks |
| 2 | | directly to a door where she greets Jamie Kane, a Captain at SCJ. |
| 3 | 7:20 a.m. | Deputy Geary and Cpt. Kane walk together to a desk and sit down |
| 4 | | in chairs directly facing one another.  Deputy Geary's back is to the |
| 5 | | module where Marilyn was housed.  For the next 18 minutes, the |
| 6 | | two remain face to face and engage in an uninterrupted |
| 7 | | conversation. |
| 8 | 7:38 a.m. | Cpt. Kane gets up and starts to walk away. |
| 9 | 7:39 a.m. | Cpt. Kane exits the module.  Geary pulls out her log book and starts |
| 10 | | to record her next round of observations – <u>before</u> they occurred. |
| 11 | 7:40 a.m. | Geary leaves her desk and starts her module checks. |
| 12 | 7:40:20 am. | Geary looks into Marilyn's cell.  Seconds later a medical emergency |
| 13 | | is declared. |

**B. Deficiencies in Snohomish County Jail's Policies, Practices, and Customs Evidence Deliberate Indifference to Marilyn's Serious Mental Health Needs.**

25.     In September 2013, after various media sources ran stories about the unusually high number of deaths at the SCJ, the United States Department of Justice National Institute of Corrections ("NIC") came to Everett and conducted an assessment of the Snohomish County Jail's medical, mental health, and suicide prevention practices.  The report summarizing the NIC's findings from the assessment was released to the public and left absolutely no doubt about SCJ's numerous failings that clearly amounted to deliberate indifference to the serious medical and mental health needs of inmates.

26.     The NIC assessment revealed a number of systemic and gross deficiencies in SCJ's

COMPLAINT – 10

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

1   staffing, facilities, equipment, procedures, and policies (or lack thereof).  The NIC assessment

2   found that "inadequate health care staffing levels, unqualified intake health screens, <u>absence of</u>

3   <u>clear and formal policies and procedures</u>, and a lack of a functional records system make timely

4   and consistent access to appropriate health care virtually impossible". (emphasis added).

5       27.      Stressing the need for jail officials and local government leaders to understand and

6   acknowledge that adequate inmate psychiatric treatment and mental health care is a fundamental

7   constitutional obligation of the jail and, therefore, a constitutional duty of local government, NIC

8   expressly and clearly informed the SCJ that the Constitution imposes a duty on jails to ensure an

9   inmate's safety and general well-being, and that this duty includes the duty to prevent unreasonable

10   risk of serious harm and mandates the jail to protect against the risk of suicide and self-harm.

11       28.      The NIC assessment revealed that defendant Trenary and the SCSO were operating

12   the SCJ with no approved health care policies and procedures.  This failing clearly amounts to

13   deliberate indifference to inmates' serious medical and mental health needs.

14       29.      In September of 2013, the NIC report clearly informed defendants Trenary and

15   Snohomish County that the SCSO's practice of operating the SCJ "with no approved health care

16   policies and procedures" in place was not acceptable.  It defies reason that Trenary and the SCSO

17   thereafter ignored the NIC assessor's directive that jail officials "immediately begin the process of

18   promulgating an evidence-based jail health care policy and procedure manual."   The NIC

19   recommended that the policies, procedures, and protocols be placed into a single, comprehensive,

20   and unified policy manual and that the manual follow the outline and content recommended by the

21   National Commission on Correctional Health Care (NCCHC).

22       30.      The NIC assessment revealed that the SCSO had no policy or practice in place for

23   providing specialty care for inmates with serious medical or mental health needs that exceeded the

COMPLAINT – 11

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

services available at the jail.  The NIC specifically recommended that the SCJ remedy this failing by developing a policy and practice that would require the Jail to provide these inmates timely referrals for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.  The NIC informed the jail that their current practice was deficient and warned that more was needed than simply providing medication, segregating, and supervising mentally ill inmates.  This recommendation was likewise ignored by defendants Trenary and Snohomish County.

31.     The NIC warned the Jail about the necessity for close supervision of any inmate who had previously been identified as suicidal, stating that close observation should be required for "the inmate who is not actively suicidal, but expresses suicidal ideation and/or had a recent prior history of self-injurious behavior".  Likewise, close observation should be required for an inmate who denies suicidal ideation, but demonstrates other concerning behavior through actions, circumstances or recent history.  The NIC instructed that "close supervision" means that staff shall observe the inmate at staggered intervals not to exceed every 15 minutes (e.g., 5, 15, 7 minutes).

32.     Even after their deficiencies were made blatantly aware to them, the SCSO, under the direction of defendant Trenary, ignored the NIC's recommendations and failed to heed their warnings.  They failed to promulgate and implement policy.  They failed to implement a standard, staggered watch that did not exceed 15 minutes for inmates, such as Marilyn, who had previously been identified as suicidal.  They failed to implement any policy or practice that directed contact or communication with community based mental health care providers.  They failed to implement a policy and/or practice that would require the SCJ to provide seriously ill inmates timely referrals for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.  They failed to develop and implement training for corrections deputies and classification

COMPLAINT – 12

LAW OFFICES OF JAMES S. ROGERS
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

staff on mental health issues and suicide prevention.  All of these failures ignore the defendants' duty to provide constitutionally sufficient mental health care and to adequately protect mentally ill inmates from the risk for self-harm and amounts to deliberate indifference.

33.    Defendant Trenary's refusal to put into effect the recommendations of the NIC coupled with his continual and repeated ratification of his employees' actions in the death of Marilyn and numerous other inmates who died at the SCJ warrant punitive damages.

## IV.    CAUSE OF ACTION: SECTION 1983 – 14TH AMENDMENT VIOLATION – DELIBERATE INDIFFERENCE TO MARILYN MOWAN'S SERIOUS MENTAL HEALTH NEEDS.

34.    Jail inmates have the constitutional right to receive and have access to adequate health care.  The constitutional rights of pretrial detainees are at least as strong as those enjoyed by convicted prisoners.  Prisoners are entitled to rights under the Eighth Amendment of the United States Constitution, while the rights of pretrial detainees emanate from the Due Process Clause of the Fourteenth Amendment.  Courts have consistently applied the same constitutional standard for inmate medical care to psychiatric and mental health services.

35.    By virtue of the facts set forth above, defendants violated Marilyn's federally protected rights by their deliberate indifference to Marilyn's serious mental health needs.  As a direct and proximate result of the defendants' deliberate indifference to Marilyn's constitutional rights, she suffered damages including pre-death pain, suffering, terror and anxiety, in an amount to be proven at trial.

36.    By virtue of the facts set forth above and the deliberate indifference of defendants, Julie Hanson and Marilyn's two brothers, lost their sister and were deprived of their constitutional right to love, society and companionship with her, for which they are entitled to compensatory and punitive damages in an amount to be proven at trial.

COMPLAINT – 13

**LAW OFFICES OF JAMES S. ROGERS**
1500 Fourth Avenue, Suite 500
Seattle WA  98101
Ph:  206/621-8525  Fax: 206/223-8224

## V.       PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests a judgment against Defendants:

1.  Fashioning an appropriate remedy awarding Plaintiff general and special damages, including damages for pain, suffering, terror, and loss of consortium pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

2.  Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as otherwise available under the law;

3.  Awarding Plaintiff punitive damages against the individual, non-municipal defendants to the extent authorized by law in an amount to be proven at trial;

4.  Declaring the defendants jointly and severally liable;

5.  Awarding Plaintiff any and all applicable interest on the judgment; and

6.  Awarding Plaintiff such other and further relief as the Court deems just and equitable.

## VI.       JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and LCR 38(b), Plaintiff respectfully requests a trial by jury on all issues properly triable by jury.

Dated: June 17, 2016                    LAW OFFICES OF JAMES S. ROGERS


s/ Cheryl L. Snow
Cheryl L. Snow, WSBA #26757
Attorney for Plaintiff
1500 Fourth Avenue, Suite 500
Seattle, WA 98101
Phone: (206) 621-8525
Facsimile: (206) 223-8224
Email: csnow@jsrogerslaw.com

COMPLAINT – 14